**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-24-01685-001-PHX-KML |
| Plaintiff, | **ORDER** |
| v. | |
| Sammel Sharon Upchurch, | |
| Defendant. | |

After pulling over defendant Sammel Sharon Upchurch for traffic violations, a police officer found a firearm and ammunition in the car Upchurch was driving. The United States charged Upchurch with unlawfully possessing a firearm and ammunition as a felon. Upchurch now moves to suppress all evidence obtained from the traffic stop on the basis that it was unlawful under the Fourth Amendment. Because the police officer had reasonable suspicion Upchurch had committed several traffic violations, justifying the stop, and then reasonable suspicion to prolong the stop based on Upchurch's attempt to hide a firearms magazine, Upchurch's motion (Doc. 28) is denied.

**I.     Factual and Procedural History**

In the early morning hours of October 6, 2024, Phoenix Police Officer Senna Fuller was on patrol near 67th Avenue and Indian School Road in west Phoenix. The area is known for high drug activity, but individuals also sometimes congregate there just to hang out. As Officer Fuller was turning left onto Indian School Road at around 1:55 a.m., he saw a group of five black males in the parking lot of One Stop Liquor on the northwest

corner of the intersection. A whistle drew Officer Fuller's attention to the group and he noticed the men had a "fearful look on their face as if they just saw a ghost." Officer Fuller found their reactions to his presence in the area suspicious. As Officer Fuller pulled into the parking lot, the group quickly dispersed with two men leaving in a gray Chrysler 300, two in a tan Buick Enclave, and one leaving on foot. The Chrysler and the Buick left the One Stop Liquor parking lot "at a high rate of speed."

Officer Fuller followed the two cars onto 67th Avenue. Both cars then made the left turn onto eastbound Indian School Avenue. Neither car signaled as it did so. Officer Fuller conducted a records check as he continued following the two cars and learned that both had suspended license plates. After watching the Buick accelerate around the Chrysler at a high rate of speed, his suspicion focused on the Buick. Officer Fuller continued following that car and saw it veer from one lane to another, cutting off a small four-door sedan, without signaling. At around 59th Avenue and Indian School, an area where the speed limit is 40 miles per hour, Officer Fuller paced the Buick traveling at approximately 58 miles per hour. He decided to conduct a traffic stop.

Office Fuller activated the sound on his body-worn camera at 1:59 a.m. as he got out of his patrol car, so the events from this point forward were recorded. Officer Fuller approached the Buick, which Upchurch was driving, told Upchurch the reasons for the traffic stop, and asked whether there were any guns or knives in the car. Upchurch said "no." Officer Fuller then told Upchurch it is a crime in Arizona to lie about guns and asked for his driver's license. While Upchurch was removing the license from his wallet, Officer Fuller shone the beam of his flashlight into the backseat and the body-worn camera lens faced in that direction. But Officer Fuller testified he had a wider field of vision than the camera and saw Upchurch try to hide a tan gun magazine that had been between his legs in the center console. When the body-worn camera lens turned back to the front seat, Upchurch's right hand was in a different position near the center console as though he had placed something there.

As soon as Upchurch handed over his license—less than one minute into the traffic

1 stop—Officer Fuller instructed him to place his hands on the steering wheel and not to
2 move. Officer Fuller, who was outnumbered by the two men in the Buick before backup
3 arrived, testified he did not want to "raise any suspicion" that he had seen the magazine for
4 officer safety reasons. So Officer Fuller instructed both occupants of the Buick not to move,
5 then patted Upchurch down, handcuffed him, and seated him on the curb (before doing the
6 same for the passenger).

7       At 2:03 a.m., Officer Fuller asked the men their names and for the backup officer,
8 who had just arrived, to run the men's identities. Officer Fuller told Upchurch he was "just
9 detained" and placed Upchurch in the back of his patrol vehicle less than a minute later,
10 but nonetheless read Upchurch the *Miranda* warning although "technically [he didn't] have
11 to." Upchurch said he understood the warning. Officer Fuller asked Upchurch, "Where's
12 the gun in the car, bro?" and Upchurch responded "it's in the glove compartment." At 2:05
13 a.m., Upchurch admitted he was a prohibited possessor and carried the gun only for
14 protection. Officer Fuller then walked back to the Buick and took the tan magazine out of
15 the center console. After confirming the location of the gun with Upchurch again, Officer
16 Fuller found two guns in the Buick. At 2:08 a.m., Officer Fuller then asked the backup
17 officer to run additional records checks because Upchurch had admitted he was a prohibited
18 possessor. The record does not make clear when any initial records checks were completed.

19       Upchurch was indicted for possessing a firearm and ammunition as a felon in
20 violation of 18 U.S.C. § 922(g)(1). He filed a motion to suppress all evidence obtained
21 from the traffic stop (Doc. 28), the government responded and supplemented its response
22 (Docs. 29, 35), and the court held an evidentiary hearing. Considering the evidence
23 presented and arguments made during that hearing and in the pleadings, the motion to
24 suppress is denied.

25 **II.    Analysis**

26       Stopping a vehicle and detaining its occupants is a seizure under the Fourth
27 Amendment. *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006). Officers
28 must therefore have "reasonable suspicion"—a "particularized and objective basis for

1  suspecting the particular person stopped of breaking the law"—for a traffic stop to be
2  constitutional. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (simplified). Courts
3  examine the totality of the circumstances to determine whether the detaining officer has
4  articulated a particularized and objective basis for suspecting the person has broken the
5  law. *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002). Although the defendant has the
6  burden of proof on a motion to suppress, it is the government's burden to produce specific
7  and articulable facts supporting reasonable suspicion. *United States v. Willis*, 431 F.3d 709,
8  715 n.5 (9th Cir. 2005).

9  To start, officers on routine patrol may follow individuals on public streets to further
10 investigate those individuals' activities. *See United States v. Washington*, 490 F.3d 765,
11 769–70 (9th Cir. 2007). It is only when the officer stops and "seizes" the person within the
12 meaning of the Fourth Amendment that reasonable suspicion is required. *Id*. at 770; *Heien*,
13 574 U.S. at 60. Officer Fuller's initial decision to follow Upchurch's Buick out of the One
14 Stop Liquor parking lot therefore did not require reasonable suspicion or probable cause.
15 And even if the Fourth Amendment had been implicated, Upchurch's selective-
16 enforcement concerns would not change the analysis. *See United States v. Steinman*, 130
17 F.4th 693, 705 (9th Cir. 2025) ("the Fourth Amendment's concern with 'reasonableness'
18 allows certain actions to be taken, *whatever* the subjective intent") (simplified).

19 Because Officer Fuller then personally observed Upchurch violating multiple traffic
20 laws, as he described with particularity in his testimony, reasonable suspicion existed to
21 support the traffic stop. In general, law enforcement officers who witness a driver commit
22 a traffic violation have reasonable suspicion to make a stop. *Whren v. United States*, 517
23 U.S. 806, 810 (1996); *Willis*, 431 F.3d at 714–15 ("ample evidence" supported reasonable
24 suspicion where officer testified he watched defendant make an illegal U-turn). Again here,
25 the selective enforcement concerns Upchurch raises do not make a difference. *See*
26 *Choudhry*, 461 F.3d at 1102 (applying *Whren*'s holding that a traffic violation is sufficient
27 to justify a stop even if "the violation was merely pretextual" or "common and
28 insignificant," and even if the stop "departed from the regular practice of a particular

precinct"). Officer Fuller's testimony that he paced Upchurch speeding and saw him turning and changing lanes without signaling amply supports the initial stop.[1]

After he made the stop—and certainly in a situation where he saw Upchurch attempt to hide a gun magazine less than a minute after the stop began while getting out his driver's license—the Fourth Amendment permitted Officer Fuller to take further steps for multiple reasons. First, Officer Fuller was generally authorized to attend to safety concerns related to the traffic stop while it was ongoing (including by removing Upchurch from the vehicle) to preserve his own personal safety. *Compare Steinman*, 130 F.4th at 704 (safety precautions like ordering a driver to exit the vehicle fall within the mission of a stop because "traffic stops are 'especially fraught with danger to police officers'") (quoting *Rodriguez v. United States*, 575 U.S. 348, 356 (2015)), *with United States v. Evans*, 786 F.3d 779, 787 (9th Cir. 2015) (holding safety precautions taken to investigate *other* crimes after traffic warning was written "do not relate to an officer's traffic mission"). Such steps, including further questioning for officer-safety reasons *during* a traffic stop need not be supported by independent reasonable suspicion. *United States v. Mendez*, 476 F.3d 1077, 1079 (9th Cir. 2007).

But second, and more importantly, Upchurch's attempt to hide a firearms magazine while the officer looked elsewhere, immediately after denying there were guns in the vehicle, gave Officer Fuller at least reasonable suspicion to prolong the stop. *See Steinman*, 130 F.4th at 709 (officer had probable cause after seeing ammunition in vehicle where defendant moved furtively and answered questions evasively). The incongruity between Upchurch's answer that there were no guns in the vehicle and Fuller seeing him hide a tan magazine seconds later further adds to the suspicion in the totality-of-circumstances analysis. *Cf. United States v. Baker*, 850 F.2d 1365, 1369 (9th Cir. 1988) (seeing ammunition and two magazines gave officer probable cause to believe firearms were in

---

[1] The facts surrounding the suspended registration violation were less clear after defense counsel's cross-examination suggested Upchurch's registration may not have been expired. Ultimately, reasonable suspicion would exist even if Officer Fuller had made a reasonable mistake as to the facts. *See Heien*, 574 U.S. at 68. But the court need not examine that violation here because other independent traffic violations justified the stop.

vehicle). Thus, by approximately one minute into the traffic stop—well before Upchurch handed his license over and Fuller asked the backup officer to run it—Officer Fuller had reasonable suspicion to prolong the stop.

Even when a traffic stop is lawful at its inception, it may later violate the Fourth Amendment if "prolonged beyond the time reasonably required to complete [the] mission" of issuing a traffic warning. *Rodriguez*, 575 U.S. at 350–51. Tasks that usually form a part of the mission of a traffic stop include checking the driver's license and outstanding warrants, and inspecting the vehicle's registration and proof of insurance. *Id*. at 356. Officers may permissibly prolong a stop beyond the time it takes to complete those traffic-related tasks only if "independent reasonable suspicion justif[ies] this prolongation." *Evans*, 786 F.3d at 787. For a stop that is constitutionally-justified at its inception like the one here, the relevant questions therefore become whether the stop is prolonged and whether that prolongation is justified by reasonable suspicion "based on the information available" at the time the stop becomes prolonged. *Steinman*, 130 F.4th at 704.

Here, it is not entirely clear whether the stop was prolonged because the government did not offer testimony or evidence regarding when the records checks on Upchurch and his passenger were complete. Based on the body camera video, it seems unlikely it was prolonged because Officer Fuller asked the backup officer to run additional checks after Upchurch admitted he was a prohibited possessor and had a firearm in the vehicle. *See id*. at 708 (officer permissibly requested a criminal records check as part of traffic stop mission after seeing ammunition in the vehicle and defendant's furtive movements). But whether the stop was prolonged is immaterial here because, as described above, Officer Fuller had reasonable suspicion to investigate further before Upchurch even handed over his license. And by six minutes into the stop, Officer Fuller had probable cause to search for a firearm based on Upchurch's post-*Miranda* admissions he was a prohibited possessor but kept a gun in the glove compartment for protection. *See id.* at 709; *Baker*, 850 F.2d at 1369. Thus, no Fourth Amendment violation occurred.

- 6 -

### III. Conclusion

Officer Fuller met the applicable standard as each investigative step became progressively more intrusive under the Fourth Amendment. Upchurch's motion to suppress is therefore denied.

Accordingly,

**IT IS ORDERED** denying Upchurch's motion to suppress (Doc. 28).

Dated this 16th day of May, 2025.

Honorable Krissa M. Lanham
United States District Judge